the table with which they are used, thereby providing a more elaborate appearance for the room.

The affidavits submitted by plaintiff indicate that the overlap and shoulder covers are chiefly used as protective coverings for wearing apparel displayed for sale in retail stores, and to protect wearing apparel in storage. Unlike any of the other furnishings enumerated in 772.35, they are not used to adorn, protect or enhance adjuncts or appendages of a house, home, room, place or situs. They lack the one common characteristic which unites all of the furnishings enumerated in item 772.35. See *Kotake Co., Ltd., et al.* v. *United States,* 58 Cust. Ct. 196, 199, C.D. 2934, 266 F. Supp. 385 (1967).

Overlap and shoulder covers are designed and used to protect clothing rather than to protect or enhance a home or any other place or situs. The articles with which they are used are dissimilar to those specified in item 772.35. Differently stated, the imported articles are designed to be used for clothing, whereas all of those set forth *eo nomine* in item 772.35 are designed to be used on articles or furnishings associated with a home or place.

The imported overlap and shoulder covers do not ornamentally or functionally protect or enhance any home, house, place or situs, or any articles or furnishings used therein. They are, therefore, not "like furnishings" *ejusdem generis* with the articles specifically enumerated in item 772.35 of the tariff schedules.

In view of the foregoing, it is the determination of the court that plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted, and the customs classification of the imported merchandise under item 774.60 of the tariff schedules is sustained.

Judgment will issue accordingly.

(C.D. 4646)

CALIFORNIA PROCESSED FRUIT CO. *v.* UNITED STATES

138

Court No. 70/7296

(Decided April 7, 1976)

*Glad, Tuttle & White* (*Robert Glenn White* of counsel) for the plaintiff.
*Rex E. Lee*, Assistant Attorney General (*John N. Politis* trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise in this case consists of cherries in syrup exported from France in drums on or about May 31, 1969, and classified in liquidation upon entry at the port of Los Angeles-Long Beach, California, under TSUS item 154.05 as glace fruits at the duty rate of 7 cents per pound and 10 *per centum ad valorem*. The only issue in the case is the proper dutiable weight of the imported merchandise. The total weight of cherries and syrup combined was utilized in the assessment of the specific rate of duty. It is alleged that the specific duty should be assessed only on the net weight of the cherries exclusive of any syrup or packing medium.

In the pleadings it is admitted that the merchandise consists of 100 drums of glace* cherries in syrup, and that the contents of each drum weighed 540 pounds.

Plaintiff's president, David Chorna, testified that he has been in the business of manufacturing and selling glazed fruits and peels since 1939, that he placed the order for the imported merchandise in this case, that he weighed the cherries and syrup in 10 percent of the imported drums and found that each 50-gallon drum contained 300 pounds of cherries and 240 pounds of syrup. As to the usage of the syrup in issue, the witness testified (R. 12):

Q. You said you drained these drums and weighed the cherries, is that correct? A. Yes; it is.
Q. After that had been done what did you do with these specific cherries? A. We took the syrup and put it back on the cherries. With the hundred drums of cherries?
Q. Yes. A. They were shipped to the Bonbon Corp., which is a subsidiary of the Carnation Ice Cream Co.
Q. Do you know whether or not the liquid in which these specific cherries arrived in the drums had any use? A. They did not have any use.

---

*The evidence reveals that the cherries are maraschino cherries which apparently were incorrectly invoiced as glace cherries.

After colloquy between the court and counsel at this point the witness further testified (R. 13–14):

> Q. Mr. Chorna, to your business, the California Processed Fruit Co., did that liquid in which these cherries arrived have any value? A. No; it did not.
>
> Q. Do you know what was done by the party to whom you sold these cherries with that syrup? A. Yes.
>
> Q. How do you know? A. I was there and saw it.
>
> Q. What did they do with the syrup? A. They put the syrup down a sewer.
>
> Q. Do you know whether or not in the processed fruit industry there is any trading, or is there any trading in the type of liquid that these cherries arrived in? A. Not to my knowledge.

The witness stated that the cherries in issue were used to make bonbons which are being sold at confectionery stands in theaters. Mr. Chorna also explained that a manufacturer of maraschino cherries would produce his own syrup in order to maintain quality control of his product, and would not utilize another manufacturer's syrup because its content would be unknown to him. The result is that there is no buying and selling of excess syrup solutions among the processed fruit manufacturers.

On the same subject of syrup usage, Adolph R. Asti, a food technologist who has been in the employ of S & W Fine Foods, wholesale grocers and food manufacturers, for 37 years [called on behalf of the Government] testified that he was one of the principals in developing a bubble spray system for making maraschino and glace cherries. On direct examination he testified (R. 58–59):

> Q. You have heard the testimony of Mr. Chorna here this morning in court, is that correct? A. Yes.
>
> Q. You also are familiar with the way that the cherries in issue in this case were packed, is that correct? A. That's right.
>
> Q. What, in your opinion, is the purpose of the syrup? A. The only purpose of the syrup in my opinion would be to prevent it from being crushed in transportation.
>
> Q. Could water have been used instead of syrup? A. Not to maintain the same product.
>
> Q. What would happen if you used water? A. Then you would be diffusing the sugar from the cherries and wouldn't have the same brix you started out with.

Whether or not the syrup in the drums in this case is dutiable turns upon the existence or non-existence of commercial value in this country for the syrup following its importation as a preservative and packing medium. *United States* v. *E. W. J. Hearty, Inc.*, 31 CCPA 106, C.A.D. 257 (1943). In the *Hearty* case the merchandise was chicken breasts packed in tins along with a gelatinous substance known as "zalivka" which surrounded the meat, as to which specific duty had been assessed against the entire contents of the tins. Upon

140

evidence furnished from users of the product to the effect that the gelatinous substance was merely a packing material which in commercial practice is discarded upon opening of the tins the trial court sustained the importer's protest against duty assessment on the gelatinous substance. Our appeals court was of the opinion that the evidence supported the conclusion of the trial court that the substance lacked *commercial value*, and affirmed the decision of the trial court. The appeals court said (p. 108):

> . . . As found by the court below, this record as a whole is quite convincing, we think, that in using the imported chicken breasts for chicken salad, chicken pie, and other dishes, which seemed to be its main uses, it was not feasible or practicable to utilize the 6 ounces of gelatinous substance in any manner, and that no practicable use for it was known.

The plaintiff-importer argues that the facts at bar are analogous to the facts in the *Hearty* case in that the syrup has no use other than as a preservative and packing medium for the cherries which is discarded after separation from the cherries. Defendant argues that the *Hearty* case is inapplicable here because the conclusion reached there was supported by the testimony of 7 witnesses, whereas here the conclusion urged by plaintiff is supported by the testimony of only 1 witness whose testimony must be characterized as weak and unconvincing.

In evaluating testimonial evidence it is not the number of witnesses who testify, but rather the quality of their evidence, which the court regards as being important for resolution of an issue of fact. In this case, not one, but both parties' witnesses have given uncontradicted evidence that the imported syrup has no commercial value in this country other than as a preservative and packing medium. And, in the court's view both witnesses, by virtue of their long experience and association in the processed fruit industry, are qualified to know the usage of the syrup in issue in the industry. Furthermore, the lack of commercial value is sustained by the fact that the syrup is discarded upon separation from the cherries. *Cf. Peabody & Co. v. United States*, 13 Ct. Cust. Appls. 80, T.D. 40935 (1925).

It is to be noted, however, that Mr. Asti stated that he had observed that the syrup of bottled maraschino cherries [to which a flavoring had been added] had been used by some people to flavor a manhattan cocktail while other people simply left it in the bottle after removing the cherries, and indicated that he would not use the syrup in that fashion. In any case, such purely subjective, personal, and occasional use of domestically bottled syrup by some consumers of maraschino cherries can hardly be considered to constitute a practicable, commercial usage of the syrup in question which ap-

parently never reaches the cherry consumer in the form imported, if at all.

On the record in this case the court finds that the case is brought within the principle of the *Hearty* case, as the evidence clearly establishes that the imported syrup lacks commercial value following its importation, and should not, therefore, be subjected to the specific duty applicable to the cherries. The allegations in the complaint are sustained. And judgment will be entered herein accordingly.